The first case for argument is Union Pacific Railroad Company v. Surface Transportation Board, et al. Mr. Blaseaton. Good morning. May it please the Court. Before the Surface Transportation Board can cause a constitutional taking by granting terminal trackage rights, it must find inadequate service. It must find that the rights are necessary to access the terminal, and it must set — You said that's a constitutional requirement? Before it causes a constitutional taking, Your Honor. The Constitution itself doesn't impose each of these requirements, but it is a condemnation. That's spent a lot of time on the Fifth Amendment. Fair enough, Your Honor. The Board has to do each of these three things. Here it violated all of those requirements, and these three errors together combined to transform a limited remedy of last resort into a novel open access scheme. In particular, the fundamental problem with the Board's decision here is that it effectively erased the inadequate service requirement that the agency itself recognized it needed to meet. METRA already provides passenger service on Union Pacific's lines, and Union Pacific is willing to continue that arrangement through a private commercial agreement. So the question here is not whether METRA is going to use the lines, but on what terms. Everybody recognized below that that was ultimately the key problem. But didn't U.P. go out of its way to make sure that it did not have to provide these lines to METRA? In other words, now you're saying that they are willing to enter a contract, but they have no obligation to. Certainly. Well, so the thing that we went out of our way to determine that we didn't have an obligation to do was actually provide the service ourselves. In 2019, when we told METRA that we wanted to discontinue, what we were referring to was Union Pacific actually operating the trains itself, not just providing the tracks. And that's what the Seventh Circuit held that we have a right to do. But the premise throughout that litigation and then throughout the negotiations that followed was that METRA would stay on the lines, just with somebody other than Union Pacific actually operating the trains, providing the crews, that sort of thing. And so Union Pacific, from the outset, took the position that it wanted METRA to stay on the lines. We make more money when METRA is on the lines, so it's in our interest for METRA to keep running. Maybe I'm missing something, but it seems to me that this is all about leverage and negotiations. In other words, what you want to do is have this implied threat of withholding access to the lines and at the same time say, well, we're always going to give them access to the lines. And that just seems to me to be a negotiating threat. What am I missing here? So, Your Honor, I do think ultimately the sort of practical issue here does come down to a question of leverage and incentives. But our position actually creates better incentives for both parties than the rule the STB adopted. That's because under our rule, what the applicant here, what METRA has to show to establish inadequate service, is that Union Pacific is not offering access on reasonable terms. If METRA can make that showing, it is entitled, provided it can check the other boxes, to terminal trackage rights from the STB. So that creates an incentive for us to deal reasonably, because if we don't, METRA can go to the board and get relief. Our position is... The best relief you can get is a remand for that inquiry. Yes. And that's what we're asking for, Your Honor. We are not asking you to hold that METRA has no... That's a little unclear from the briefs. I apologize. Let me try to be clear about this. The thing that we would like you to tell the board to do, we'd like you to vacate the decision, remand, and then tell the board to consider whether Union Pacific's proposed terms of access are reasonable or not. And if the board concludes that they are not reasonable, then that threshold requirement is satisfied, and METRA is potentially entitled to terminal trackage rights. Where is that step in the statutory process? Isn't that inserting a step that is not contemplated in the statutory scheme? I don't think it is, Your Honor, because as the Seventh Circuit explained last year in Grant Trunk, the inadequate service finding is the initial threshold requirement for terminal trackage rights. And our position just reflects how that works, practically speaking, when the question is not to competing freight carriers, but is instead a passenger railroad, a commuter railroad, that wants to gain access to freight trackage. Well, the board in this case did actually find, alternatively, that there was inadequate service. Wouldn't that be sort of applying what the rule that you want us to send this case back for them to decide? No, because although the board found inadequate service, the entire basis for that finding was that Union Pacific does not itself provide passenger service on these lines, and that is a test that every freight railroad in the country will fail everywhere across its network. And the reason the freight railroads don't provide passenger service is because Congress abolished their obligation to do so. So there has to be something beyond just the fact that a — But they still can. Yes, they could.  No, certainly they are not prohibited. And here, passenger service, as METRA points out, has existed on these lines for decades, and our hope is that it will continue to exist on these lines for decades with METRA providing it. Our position is simply that METRA cannot show inadequate service to itself or to its end-user passengers unless METRA can show that Union Pacific's proffered terms of access are unreasonable. But you don't have to take my word for it. METRA's application for terminal trackage rights before the board, this is at pages 11 and 12 in the appendix, said that METRA ultimately needed terminal trackage rights. The problem I have with that is what's underlying your desire to force them to negotiate is this implied threat that you will withdraw access. That's so — That's the problem I'm having. And if I can, doesn't your argument really kind of merge with your other argument, which essentially is they should have — the board should have determined the terms of compensation before making this determination? So I think it's a little bit different than that, Your Honor, because certainly, you know, we recognize that there are two steps in the statute, right? There's the question of is the applicant entitled to access in the first place, and then there's the question of if so, what terms of compensation apply? We're not suggesting that you should reverse the order of those steps, and we're not suggesting that the board had to do the same inquiry that it would do at step two at the outset. Our point is that if Union Pacific is already offering METRA access to the tracks on reasonable terms, service is adequate. And let me give you a stylized example to show you why I say that. Suppose we offered METRA the trackage rights that they already have, that they're already using, for $0 for 5 years. We said you can — for free. You don't have to pay us anything at all for 5 years. Just keep using them. And they said, no, we want 50 years. Could you really seriously say that either service from Union Pacific in that situation? No. And again, METRA itself recognized this. At pages 11 and 12 of the appendix, METRA's application to the board said, METRA needs terminal trackage rights because Union Pacific is unwilling to grant METRA access to its lines other than based on unreasonable economic terms. That is what this dispute ultimately was about. If you look at the very first page, the very first sentence of the Surface Transportation Board's brief to this court, it says that this dispute is ultimately about the amount of compensation. That is right. The problem is — To me, you have leaped past an essential initial question. You're arguing for de novo review of the board as though we are reviewing a breach of contract decision by a court. I think the ICC 100 years ago was entitled to basically complete deference. And that's been modified to some extent, but not the extent you're arguing today, which is ignore it. There is no deference question here. And so I think you need to define for me the impact of Loper-Bright on our review. Certainly, Your Honor. The briefs don't do it. So what our briefs are trying to convey is that the board conveyed — applied, excuse me, the wrong legal standard. And that is the thing that Loper-Bright is very clear about. Courts ultimately decide for themselves what the statute means. Our view — and this is the same analysis that the Seventh Circuit went through. The ICC in the old days definitely had the discretion to do that. It wasn't even second guessed. So I'm not sure that's entirely right, Your Honor. But even — Go back to the 20s and teens and 30s. So — No question about it, in my view. So — Having dealt with that for decades. Fair point, Your Honor. But if you start from that point, even if you start from that premise, you have to then move up through the Chevron deference doctrine and then what the Supreme Court said about it in Loper-Bright. Well, what's the impact, though? You don't brief that. The impact is that this Court decides for itself what the statute means. We are asking you to hold, not that the Board abused its discretion. What district court cases address that regarding the surface transportation board? Loper-Bright is not agency-specific, Your Honor. It applies to every Federal agency reviewing every Federal statutory — But it doesn't apply equally to every Federal agency. Come on. Your Honor, it does. I have to disagree with you. The Supreme Court was very clear that as a matter of the construction of both the Administrative Procedure Act and the Constitution, Federal courts decide for themselves what Federal statutes mean. Certainly, they can take into account an agency's long-held, contemporaneously adopted and consistent interpretation of the law. But if the question is what does this statute mean as opposed to what discretionary decision did you reach within the bounds of your discretion, the Court decides for itself de novo. And I do think Loper-Bright is crystal clear about that, and I'm not aware of any post-Loper-Bright case from any court of appeals that says otherwise. Now, my friend certainly will tell you that Loper-Bright also points out that words like reasonable or public interest connote some amount of discretion. And I don't disagree with that. But here the problem is that the public interest test is not written on a blank slate. The Seventh Circuit explained just last year that that ultimately requires inadequate service, and that that's what But here we have a metro, which is the commuter rail, which at least in the Congressional history suggests that that's just a different animal, and that why are we applying the same standard to the commuter rail than we would competing freight carriers? Sure. So I'm not suggesting that you would apply exactly the same test. So, for example, in the context of competing freight carriers, the applicant actually has to show anti-competitive conduct as a threshold showing for inadequate service. We're not suggesting you have to do that here. We did make an argument along those lines below. We're not pressing it. Our point is that the sort of top line standard is inadequate service for the reasons the Seventh Circuit explained, but it does work differently in the passenger context. And how do we address some of this, the conference notes that say when it is a public transportation system, that will almost always satisfy the public interest? So I think the arguments about the conference report sort of underscore the perils of relying on legislative history above statutory purpose, text, structure, and history, because the last sentence of that conference report passage, admittedly in a vacuum, very good for my friends. The sentence before that, much better for me. And some of the briefs, I think, are almost parsing the conference report as if it is the statute. It is not. And the reason — No, I understand. But help me understand why that isn't informing the statute. What is it about the statutory language that you're saying overcomes any kind of reliance on that to help us understand this? I think everybody understands — I think everybody agrees that there is a difference between a commuter rail and a competing freight carrier.  So tell me what in the statute tells me I can't even consider that to be some kind of informative guide for how we resolve this. The key point is that the statute did not change when Congress put that language in the conference report. The text of 11103 was the — and 11102, for that matter, which is discussed in that passage, was the same before and after. All Congress did in 1995 when it made that observation in the conference report was give commuter railroads access to — or preserved the board's power to grant, more precisely, terminal trackage rights under the existing public interest standard, under the existing up through 1970 when Congress abolished the freight railroad's passenger obligation up through 1995 in ICTA. The statute was consistently understood to require a threshold showing of inadequate service. That's what the Seventh Circuit explained last year in Grand Trunk. And Congress did not change the language that had been construed that way when it reenacted these provisions in ICTA in 1995. So the fact that Congress gave commuter railroads access to apply for terminal trackage rights, as that remedy had always existed, is inconsistent with the idea that Congress intended to give commuter railroads a free pass to as much freight railroad track as they would like whenever that they would like it. But is it really that far? There are still limitations on the — on the terminal rights. I don't see any limitations in the board's decision. I think the board thinks that it can grant terminal trackage rights for as much track as it would like for a commuter railroad applicant, provided that it makes some noises about case-specific factors. And that is not a limitation. Well, I mean, maybe you're not giving the board enough credit in any kind of case. And I'm not sure it's noise that they're relying on. They're going to look at the I'm not so — I'm a little curious about the parade of horribles and that this will be a terrible result for companies like your client. So I — well, so let me back up a little bit. Setting aside the question of the scope of the rights, I'm just going back to your inquiry about what happened in 1995. The key point is that Congress did not change the actual terminal trackage rights statute. It was the same in 1994, in 1996, as it is now, and going all the way back to 1920. So my friends need you to conclude that by putting that language in the conference report, which not one legislator voted on, which — and which the President did not sign into law, Congress was implicitly changing the meaning of a statute whose text did not change and which Congress had elsewhere reenacted by specifically endorsing the interpretation that we're putting forward, which is that inadequate service was a threshold requirement. And I'll just say one more thing before I reserve the balance of my time for rebuttal. I do think that actually the Board's decision here is something of a Pandora's box, because if METRA is entitled to use Union Pacific's tracks, because Union Pacific does not itself provide passenger service, that will be true for every existing or existing railroad in the entire country that either operates across State lines or will do so. That's hardly — that's hardly the only Pandora's box in regulation of freight railroads. That may be true, Your Honor, but the question is whether the — It's all over the place. Whether the terminal trackage rights statute can plausibly be read to create that result. And I don't think in light of its history it can. Well, I read the Board to be saying — you said aspiring as well as existing rail  track. And I understood the Board to be saying one of the factors was this was a longstanding commuter rail that had been in place for decades and servicing millions of people. So I don't know about the aspiring commuter rail part of that. Certainly the Board did say that, but the Board's view of inadequate service does not actually turn on whether there is even a current commuter rail service in place. The Board said service is inadequate because Union Pacific does not itself provide passenger service or have any obligation to do so. And that is true everywhere across the freight rail network. I'll reserve the balance of my time. Let me ask you this. Was the Board's brief to the second — how did the Board's brief to the Seventh Circuit in Grand Trunk differ from its position today in this case? So here, I think the Board has adopted somewhat different positions. It's actually METRA's brief here that looks just like the one the Board filed in Grand Trunk. And in that respect — In defense of the Board. In that respect, it's very, very similar. Everything that METRA is saying here about the inadequate service test is what the Board said to the Seventh Circuit in Grand Trunk, and I think the Seventh Circuit there correctly rejected all of those arguments. So the premise I would submit for interpreting the statute we'd start from is inadequate service is required, and then how does it work in this context? Thank you. Ms. Katchkin? Thank you. May it please the Court, Caroline Chaykin on behalf of the Surface Transportation Board in the United States. What Union Pacific is asking this Court to do with its new statutory interpretation arguments is to do with a new interpretation of the statute.  And that is to draw unsupported atextual lines and impose restrictions on what are very flexible statutory terms, reasonable distance and in the public interest. The Board's — Are we talking about who interprets? Yes. I mean, we agree — Maybe the Board. We agree that the Court interprets statutes, but both Loper-Bright as well as this Court in the Zimmer Radio decision recognize that there are certain terms that provide some flexibility and discretion to the agency. And in the public interest is one of those terms, as is reasonable, the word reasonable. How does that affect deference? It requires the Court to make sure that the Board engaged in rational decision-making and did not exceed the outermost boundaries of its authority, statutory authority. We would argue that the — And then whatever they say goes. Not necessarily. There has to be reasons — I'm having trouble with your argument. There has to be reasoned decision-making. And the Board did not adopt any bright-line tests or rules or anything here. It really decided this case on its very unique set of facts, the fact that this was a long-established use for decades. Their view of included trackage was endless. Not necessarily. No, it — Well, you don't bother to tell us what the right answer is under there if they — Well, we — I mean, we would think that it would be — They aren't going to tell us. It is arbitrary for — it would be arbitrary for the Board, and the agency has long — I think that's the definition of reversible. I mean, I think that there are limitations to what the Board could grant length, you know, in terms of the reasonableness of the distance. Who decides that when? Congress intended for the agency on each case's individual facts and circumstances to determine what is a reasonable distance outside of the terminal. Well, this one was not. That is what Union Pacific alleges — My father commuted on the Northwest Line. I've ridden the North Line to Milwaukee. I've probably ridden the West Line. Their interpretation of convenience to commuters and how — and every commuter — I mean, we're talking halfway across Indiana. I do think that that isn't necessarily true. I mean, this is — what Metro was arguing — No, but you're directly demanding that we give them the discretion to say that. Well, no, I am not. I am saying that the Board's decision here on its very unique, specific facts concluded with a lot of support and record evidence that because Metro's use was long established and not new, because it was a commuter entity that needed access from multiple points of access to properly serve its terminal functions of bringing people from the surrounding communities — Because it was a Chicago public agency. It is a reasonable distance in those very specific facts and circumstances. I'm not saying that every case of a established — And if we disagree? I mean, if you disagree, you would have to set what is essentially on this record an entirely arbitrary limit and cut off perhaps thousands of Chicago commuters based on no evidence. We don't do it. We just say the Board didn't reasonably do it. They stepped outside their statutory job description. Well, I would argue that this is within a reasonable — I mean, Union Pacific provides no evidence for why any point outside of the terminal and still along these lines would be unreasonably far or problematic or interfere with their business. This is an efficient-moving, very short sets of trains that has been using these lines for decades. You've just included Rockford, Illinois, for sure. We're not arguing that anywhere in Rockford, Illinois. What you just said, what's viewed in the community as, you know — I think if there were evidence on the record — I can tell you it doesn't take much evidence to get people in Rockford, Illinois to say, darn right, we are part of their trackage, the trackage that's included. Yes. I do think that this is not — we're not saying that our discretion is unbounded. The Board didn't do that. They just wrote a test that said we can do it when we feel like it. The word is reasonable, and the Board determined — This is not reasonable. — on the basis of — and Congress declined to say, you know, set an end limit. It declined to say that anything just outside the terminal. It also has — there's nothing in the statute requiring that it serve terminal functions, as Union Pacific asks. I do imagine there could be a scenario where if there were evidence on the record from a demographics expert or economist that this distance would not support enough commuters for it to be within the Congress's intent for commuter rail, it might — Your statutory interpretation analysis is about 2 percent of what I'm familiar with. I think that the statute just doesn't say anything more about what is encompassed other than tracks for a reasonable distance. Congress has said we don't have — the Supreme Court has said they don't have to. Well, particularly moving to the inadequate service standard, we think it is questionable whether Grand Trunk applies at all. We disagree with Union Pacific that an inadequate service test under Grand Trunk that the Board applied here would mean every railroad would fail. We have an example. BN is actually providing service to commuters in Chicago for Metra. That is — you know, that is a situation of providing service. Not every single situation is going to fail an inadequate service test. It just depends on the specific facts here. How do you respond to counsel's 5-year, 50-year hypothetical? Well, I mean, it really depends on the specific facts and circumstances. Here, Union Pacific was providing no service, and all it offered was a COE, a take-it-or-leave-it set of terms and conditions Metra didn't agree to that expires at the end of next month. It's a temporary stopgap measure that in no way secured Metra's access so as to justify the complete and utter lack of service. Now, if the railroad were actually providing service, it would be a different inquiry. If the railroad were promising secure — like a long-term lease or secure access, a contract that lasts for many, many years, that would be a different analysis. Let me ask another question. Isn't the statute pretty clear that the Board has to set up terms and compensation before granting track access? The — we do not need to set — or set — the Board does not need to set terms and conditions before access. The compensation must be adequately secured or paid before access begins. But does the statute say adequately secured? Say that again. Excuse me. Does the statute say adequately secured? Yes. It says compensation shall be paid or adequately secured before use commences. So Union Pacific's interpretation would read the words or adequately secured entirely out of the statute and say that compensation is due immediately. But here, the Board actually told METRA to continue paying. It has continued paying under the terms of their prior agreement. And it also found compensation adequately secured for at least three different reasons. It made sure that — So did it determine that the compensation going forward should be what was in the past? No. It simply said that — Shouldn't it have? We don't believe that that's what the statute envisions. The statute requires the parties themselves to negotiate and establish compensation first before the Board is even allowed to do anything. That is why there — Well, there's apparently an impasse there, right? Doesn't the Board need to settle that to grant the access going forward? Well, we believe, especially in a case here where there are ongoing conditions, where there is compensation actually being paid, where the Board has given its pledge that it will — that compensation and retroactively ensure reimbursement to Union Pacific from the date of the beginning of the trackage rates usage, all of that, especially under the D.C. Circuit's decision in Southern Pacific, all of that, and this plain language of the statute, makes very clear that that was appropriate and certainly not arbitrary and capricious for the Board to do here, to follow this plain language of its statute. This is not a case either where there are absolutely no terms and conditions in place. Public agencies are always financially responsible. Well, this is not a public — well, this is a quasi-public agency that is subsidized by taxpayers.   I grew up in Chicago. Don't give me that. Well, it is definitely something that the Board has to oversee and ensure, and its pledge is, in a sense, a way of overseeing and making sure that METRA reaches its financial — meets its financial obligations. So what happens — excuse me. When do you determine when there is an absolute impasse, and the Board comes in and does the condemnation procedure? Typically — yeah, typically the parties will tell us that they have negotiated and reached an impasse. In fact, at this stage, we require the parties in March to go back and continue negotiating, and they have come back to us with a status report that they have reached an impasse, and there are three categories of things that they would like us to resolve. We maintain jurisdiction to resolve all of those things. We are overseeing all of that. But I do want to address Union Pacific's claim that this is somehow open access, or what, you know, what the Board did here is you're going to open the floodgates. The statute has many statutory criteria. The jurisdictional requirements, the practicability and lack of substantial impairment, which Union Pacific never disputed here. This is a unique case. So it's highly unlikely that any existing or potentially aspiring commuter agency would be able to meet these requirements, particularly in a very congested, heavily freight-trafficked area. How would an aspiring commuter rail company meet those standards? Is there a way to get in and be in a position of METRA? I mean, potentially. They would have to argue that their use and, you know, the operating plans and the way that they would coordinate with the freight carrier and their usage would not substantially impair the freight carrier's business. Would there be a jurisdictional restriction out of the gate? It would have to meet the jurisdictional requirements that were in place before 1996 when ICDA changed the rules and otherwise relieved the Board of jurisdiction over public transit. I'm not holding you to this, but do you have a sense of how hard that would be for an aspiring commuter rail? It depends on a lot of factors. It depends on how congested the terminal area is, the topography, the configuration, how many other carriers are in the area, how many shippers and shipper facilities are in the area. There are so many complex and often competing criteria and facts and circumstances, which is why for these particular statutory terms, in the public interest and reasonable distance, Congress decided to leave the determination to the agency based on each case's individual facts. Union Pacific is just creating new tests out of whole cloth. Where do we get – what support do you have for that assertion of what Congress intended? Well, I mean, Loper-Bright – You won't let us look at legislative history. Loper-Bright says that terms like reasonable and appropriate and Zimmer Radio, this Court's decision, Zimmer Radio, said a public interest standard provides significant discretion to an agency. But here there is actually a conference report that says that a public transportation Which you've told us to ignore. No, I'm not telling you to ignore the – he's telling you to ignore the legislative history. We believe the legislative history shows that the Congress intended that a local transportation authority would virtually always meet the public interest standard, which means there can't be some – As long as we ignore the sentence you don't like. Well, no. We're not ignoring any sentences. We're ignoring a completely made-up public interest determination that somehow the Board has to consider the terms and conditions on a commercially reasonable standard nowhere in the statute and do it before the parties even negotiate compensation and before we are allowed to do that. I see that my time is running up and I want to leave time for my co-counsel over here, but I do want to stress that the Board's decision was thorough, thoroughly supported based on the record, and we respectfully request that you affirm the Board's decision. Thank you very much. Thank you. Mr. Bannard. Good morning, Your Honors. May it please the Court. I think the summary of this case is that Congress granted regulatory discretion to the Board. The Board exercised it reasonably, and this Court reviews it deferentially. I think that's the framework of the case. I want to jump right in. Judge Grunder, you asked, isn't this about negotiating leverage? Yes. Union Pacific has Chicago over a barrel and it wants to keep them there. They've invested a billion dollars and it wants to use the threat of exclusion to do terms. Congress, however Then why isn't the Board required to set the terms of compensation before allowing this access? Because the statute has the opposite order. Do they do that routinely? The statute has the opposite order, Your Honor. It's 11-102. It's not very long. The text says, first, determine whether to grant a right of use. Then the parties negotiate. That's the second sentence. The rail carriers are responsible for establishing conditions and compensation for use of the facilities. After the right is granted. But doesn't the statute also say compensation shall be paid or adequately secured before a rail carrier may begin using the facilities? Yes. Adequately secured, paid or adequately secured. And here, what's undisputed, Your Honor If we don't know the amount, how do we know, how can we know that it's adequately secured? Yeah. There are two, well Is it enough just to say it's a public entity and therefore it has unlimited access to taxpayer funds? No, no. That's not what's going on here. METRA had been using this for 50 years with Union Pacific. The Board said, keep paying them what you've been paying them. METRA has kept paying them. And then the Board said, to the extent there are adjustments, METRA will pay them. So on the facts of this case, Your Honor, that was entirely reasonable because METRA has kept paying on that. Let me ask you. Were the terms, you know, they're at $100 a foot and you're at $1 a foot. Were those terms presented to the Board? And did the parties ask the Board to settle this compensation issue? The parties asked the Board to resolve some interim terms. They never asked the Board to set any final terms. Because the statute says, this is, it's all about It doesn't seem like the parties have been very successful at getting through this impasse. No, and, of course, their negotiations would be different based on whether Union Pacific can toss them out or not. And Congress's point is, Congress made this decision. It could have said, deferentially set terms, we'll review them if it's reasonable. Only if they aren't deferential review, you can grant a right of use. Congress said something different. It said, if the public interest supports a right of use, first grant the right of use, then the rail carriers negotiate there. Judge Kelly, you asked the question, where does this, you know, reasonable terms term come in the statute? The answer is, it's not there. The statute says the term is in the public interest. Their argument is three steps removed from the statute. Statute says in the public interest. The Board historically has said that means practical necessity or compelling need. In the context of freight on freight, it says you're not going to be able to show a compelling need unless the existing freight carrier is providing inadequate service. And here now they say, well, when no service has been being provided in the passenger, instead of saying no service, you look at reasonable terms. So what they're really doing is they're making a policy argument and asking this court to write it into the statute when it's not there. But, of course, policy discretion is for the agency. Judge Loken, this is your question. After Loper-Bright, what do we do here? Interpretation is for the court de novo. Policymaking is for the Board with discretion. So the question, public interest, is that interpreting or policymaking? This court in Zimmer Radio held last year it's policymaking because there's no way you can interpret public interest and figure out what that means. The same thing is true of reasonable. Loper-Bright said for a reasonable distance, reasonable is policymaking. It's just line drawing. No matter how long you look at reasonable, you're not going to find a length there. Can you offer any limiting factor to that? Yeah, well, Congress placed like five limiting factors on this authority, but I want to focus on one for length. I'm talking about the length of track here. So for length, this power can only be exercised for commuter rail. Commuter rail is defined in 49 U.S.C. 24-1023 as short haul in a metro-suburban area. So short haul in a metro-suburban area. By definition, that constrains use. Intercity Amtrak is specifically something different. In the context of railroads, distances are a little different than normally. In 24-1027, Congress puts the limit. It says long haul is 750 miles or more. 750 and under is not long haul. It's short haul. This is commuter service defined, you know, it's only a local government authority, only for passenger service. So, but just to go back, you know, they say this is an elephant of an authority. I think it's more like a poodle. It's moderately sized and you have to groom it in all sorts of ways before you can even use it. So Congress can only, has only authority over common rail carriers. That's the only ones it can order in the first place to grant a right of use. Common carriers know what they're getting into. When Union Pacific bought these tracks in 95, they'd been used for commuter service for 100 years. Now it wants to stop. It got that authority in 95 to stop. But the tradeoff is Congress said, okay, you can stop. But if you stop, if the board finds it in the public interest to keep it going, it can order you, the carrier, to let somebody else, a government authority, use it. So it's limited by who can be ordered. It's limited by who can be given the right. It's only a local government authority providing this commuter service. It's only a right of use. That's all the initial authority is, grant a right of use or not, and then the parties negotiate. Only if they disagree can the board step in. You can only do it if it's practicable, if it's in the public interest and there's no substantial impairment. You can only do it that. You can only do it over mainline tracks for a reasonable distance, and then it has to be paid for. So, like I said, this falls within the heart of the kind of regulatory discretion Congress can delegate and did delegate. Are you suggesting that there's a different analysis for reasonable distance when it's a commuter rail? Yes, and the board said so. The board expressly said there that reasonable use, oh, go ahead. No, I just, is that, then is that baked into your reasonable argument or is it statutory somewhere or congressional history or any? No, what it is, Your Honors, like I said, the statutory term is in the public interest. Our argument, the board's argument is that, well, the public interest is obviously different for commuter versus freight, and reasonable distance is different in the discretion there. Because freight, if you're hauling it from Chicago, a 15-mile detour at the end makes no difference at all. And so only short distances have been found to be reasonably necessary there. But if you're trying to come from the north to Chicago and then you've got to loop all the way around and go through Wheaton and come in, 15 miles makes it useless. I think all the litigation involving the Minneapolis, Northfield, and Southern Railroad over the decades would suggest that it ain't that simple. Yeah, I mean, I may be exaggerating just a bit, Your Honor. But the point is, is that Congress, this is a policymaking area. It's super complicated. The choice Congress made was to give discretion to the board. The question for this Court is did it exercise it reasonably? And it sure explained this, and it didn't open the floodgates. So I see I'm past my time, but if Your Honors have questions. I have one question because there's so much to absorb here and I haven't barely begun. And what occurs to me is if we agree with the analysis and result in Grand Trunk, what impact on this case? In other words, does it mean we remand or what? Well, first of all, I agree the most this Court could do is vacate and remand. But to your point, if you agree with Grand Trunk, Grand Trunk nonetheless doesn't apply here for a couple of reasons. First, as Judge Kelly pointed out, it's freight on freight, and the service inadequacy test there is designed for that. It's basically we won't allow you to undermine an existing carrier. But the analysis that suggests the Court saw the A and C issues as they didn't say they get the same answer, but that's what the analysis suggests to me. Yeah, what they did, Your Honor, is they held that the board's past practice of requiring service inadequacy in order to find a compelling interest, in order to find the public interest, they found that Congress had made that exercise of discretion a rule of law. That's what they found, service inadequacy. And assuming we agree with that, including that it applies to A as well as C. Yep. If you agree with that, then you defer to the board. No service is inadequate service. Union Pacific is providing no service. And the board said, well, that's inadequate service. And that's clearly reasonable. To get to where Union Pacific wants to go, you have to go a step beyond Grand Trunk and say, not only does this broad-term public interest mean only service inadequacy, but when you're providing no service, what it means is if you're offering reasonable terms to provide somebody else, then it can't be in the public interest. Like, that's a super-constraining statutory construction spun out of four levels of removal. I just don't think after Loper-Bright and Seven Counties Infrastructure, like, that's how this court did it. And this court, by the way, is bound by Zimmer Radio. That's its precedent saying public interest is a grant of discretion. The Seventh Circuit in Grand Trunk was bound by its prior case, Central Railroad, Central something from the 80s, that relied on legislative history to put a constraining reading on the statute. So your precedent binds you to go the opposite direction and find discretion than the Seventh Circuit's precedent binding them to this constraining interpretation. Thank you, Your Honors. Thank you, counsel. Your Honors, both of my friends on the other side suggested that the approach we're suggesting on inadequate service, that you would look and see if our proffered terms are reasonable, is made up. It is not made up. All we are asking you to do is what the ICC itself did in MidTech, which is cited in our reply brief at page 10, where the agency said if access is already provided, then the question is, are the terms of access reasonable? That is all we are asking you to do. We are not asking you to break new ground here. That is a common-sense way to come at it and is something the agency has done in analogous situations. Judge Loken, on your question about whether the distances at issue here are endless under the Board's test, absolutely, yes. My friend suggested to you that, really, this is not an elephant, it's a poodle. And then in the very next breath, he told you that anything short of 750 miles is short-haul. If the Board has the power under the Terminal Access Statute to give any existing or aspiring commuter agency that meets the very broad jurisdictional requirements up to 750 miles worth of trackage rights, this is exactly the elephant that Congress would have written in different terms that would look much more like the Amtrak statute. Judge Grunder, you asked about the obligation to determine money first. That is exactly what the statute says. I grant, my friends, it says paid or adequately secured, but adequately secured in 1920 in the condemnation context was a term of art that meant a bond. No bond has been put forward here. My friends have never addressed the cases that we've collected showing that that's what the term would have been understood. You're not suggesting that we should determine the terms that are reasonable? No, certainly not. We're suggesting that before the Board could make the rights effective, it had to at least set interim terms and compensation. Now, my friends have emphasized, well, METRA is still paying. Our view is that they are dramatically underpaying us and that at the pace the Board is moving, that is going to be true for a long time. That is simply not the process the statute contemplates. Judge Kelley, on the scope of the jurisdictional requirements, you asked how easy would it be for an aspiring commuter railroad to meet those requirements. If you look at the authorities we've collected on pages 5 and 6 of our reply, the answer is very easy. They just have to operate across State lines, plan to operate across State lines, or operate in one of 29 different States, which includes some of the biggest States in the country. So it's not hard to get over that initial threshold. And then finally, Judge Loken, on the question of Gramtrunk's effect here, my friend finished by, I think, giving you a pretty direct pitch for a circuit split. He told you your precedent requires you to interpret public interest to confer discretion and the Seventh Circuit was constrained to go the other way. I do not see a basis here to split with the Seventh Circuit on the meaning of this You are not construing the phrase public interest in a vacuum. Rather, this is a term that Congress used quite advisedly. And if we want to talk about legislative history, then let's look at the legislative history of the Staggers Act in 1980, which said this is the same public interest test the ICC has always applied in this context, and that means actual necessity or compelling need, and that, as the Seventh Circuit explained, means inadequate service. So that just brings us back to the start. What does inadequate service mean? Where there is a passenger carrier who wants to use freight lines and, as here, is already using them. The sensible approach there, as the ICC explained in mid-tech, is to ask about the terms that the freight carrier is offering. And I'll just close by pointing you to, again, METRA's own application to the STB said that METRA needed terminal package rights here in this case because Union Pacific is unwilling to grant METRA access to its lines other than based on unreasonable economic terms. That's always been the beef here. It still is. And that is the thing the Board should have done. And as you said, Judge Gonder, that's what they failed to do before they granted the rights and made them immediately effective. Thank you. Thank you, counsel. Very complicated case. Significant legal issues and practical implications. It's been thoroughly briefed. An argument, for me, has been very helpful. We'll take it under advisement. Thank you.